# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE | § | **CASE NO. 09-11451** |
| | § | **(CHAPTER 7)** |
| **JAMES H. BASS,** | § | |
| | § | |
| **DEBTOR** | § | |
| **C. DANIEL ROBERTS, CHAPTER 7** | § | |
| **TRUSTEE,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **v.** | § | **ADVERSARY NO. _____** |
| | § | |
| **J. HOWARD BASS & ASSOCIATES,** | § | |
| **INC., ESPERADA HOLDINGS, INC.,** | § | |
| **J. HOWARD BASS, INDIVIDUALLY,** | § | |
| **PEGGY SUE BASS, INDIVIDUALLY,** | § | |
| **JAMES H. BASS, INDIVIDUALLY,** | § | |
| **BODDEN & BODDEN ATTORNEYS AT** | § | |
| **LAW, AND BODDEN CORPORATE** | § | |
| **SERVICES, LTD.** | § | |
| | § | |
| **DEFENDANTS.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE CRAIG A. GARGOTTA,
UNITED STATES BANKRUPTCY JUDGE:

COMES NOW C. Daniel Roberts, Chapter 7 Trustee, in his capacity as Chapter 7 Trustee

for the Bankruptcy Estate of James H. Bass (the "Trustee"), and files this Original Complaint. In

support thereof, the Trustee would respectively show the Court as follows:

### I. JURISDICTION & VENUE

1.      This adversary proceeding and the claims asserted herein include core proceedings

arising under Title 11 of the United States Code (the "Bankruptcy Code"). As such, this Court has

jurisdiction over this proceeding and the claims herein pursuant to 28 U.S.C. §§ 157 and 1334 and the

Standing Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc* entered in the United States District Court for the Western District of Texas on August 13, 1984. Venue for this proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. PARTIES AND VENUE

2.      The Trustee is the duly authorized Chapter 7 Bankruptcy Trustee for the Bankruptcy Estate of James H. Bass.

3.      J. Howard Bass & Associates, Inc. ("Bass & Associates") is a Texas Corporation. J. Howard Bass & Associates, Inc. may be served with summons and complaint through its registered agent, J. Howard Bass, at 3609 Williams Drive, Suite 105, Georgetown, Texas 78628.

4.      Esperada Holdings is a company formed under the laws of the Cayman Islands. Esperada Holdings may be served with summons and complaint by serving its registered office via international registered mail at Bodden Corporate Services, Ltd., 802 Grand Pavilion Commercial Centre, P.O. Box 10335, Grand Cayman KY1-1003, Cayman Islands.

5.      J. Howard Bass is an individual residing in the State of Texas. He may be served with summons and complaint at 3609 Williams Drive, Suite 105, Georgetown, Texas 78628.

6.      Peggy Sue Bass is an individual residing in the State of Texas. She may be served with summons and complaint at 4202 Oro Court, Georgetown, Texas 78628.

7.      James H. Bass (TDCJ # 01630629) is an individual incarcerated at Lyncher Correctional Facility in the State of Texas. He may be served with summons and complaint at Lyncher Correctional Facility, 2350 Atascocita Road, Humble, Texas 77396.

8.      Bodden & Bodden Attorneys at Law is an entity formed under the laws of the Cayman Islands. Bodden & Bodden may be served with summons and complaint may be served with summons and service by serving its registered office via international registered mail at Bodden Corporate

4442488.1
56171.4

Services, Ltd., 802 Grand Pavilion Commercial Centre, P.O. Box 10335, Grand Cayman KY1-1003, Cayman Islands.

9.　　Bodden Corporate Services, Ltd. is an entity formed under the laws of the Cayman Islands.　Bodden Corporate Services, Ltd. may be served with summons and complaint by serving its registered office via international registered mail at Bodden Corporate Services, Ltd., 802 Grand Pavilion Commercial Centre, P.O. Box 10335, Grand Cayman KY1-1003, Cayman Islands.

### III. STATEMENT OF FACTS

10.　　James H. Bass ("Jim Bass"), J. Howard Bass & Associates, Inc. ("Bass & Associates"), Esperada Holdings ("Esperada"), Peggy Sue Bass, and J. Howard Bass have been involved in years of conspiracy, fraudulent concealment, and the transfer and hiding of assets that would otherwise be available to satisfy the claims of Jim Bass' creditors.　The simple and obvious fact is that Jim Bass formed Bass & Associates and Esperada for the purpose of shielding income and avoiding personal liability.　One hundred percent of Jim Bass' business has been conducted through Bass & Associates and Esperada through his direction and control.　Moreover, Bass & Associates and Esperada have been utilized by Jim Bass repeatedly as the instrumentality of his fraudulent concealment and transfer of assets that would otherwise be available to satisfy the claims of his creditors.　In sum, despite observance of certain "corporate formalities," Bass & Associates and Esperada are nothing more than the alter egos of Bass.

11.　　Following is a description of various entities and parties involved in the underlying transactions, businesses, and/or the facts contained in this Complaint:

(a)　　**The J. Howard Bass Irrevocable Trust (the "Trust"):**　The Trust was settled by Jim Bass' father.　The Trust originally owned 100% of the stock in Bass & Associates.

3

(b)    **Peggy Sue Bass:** Peggy Sue Bass is Jim Bass' wife and the Trustee of the Trust. In 2008, the stock in Bass & Associates owned by the Trust was transferred and Peggy Sue Bass was given 122.5 shares of stock. Excerpts from Peggy Sue Bass' examination transcript are attached hereto as *Exhibit A*.

(c)    **J. Howard Bass:** J. Howard Bass is Jim Bass' son. J. Howard Bass was born on May 1, 1989. J. Howard Bass is nominally the President of Bass & Associates and Esperada. J. Howard Bass was given 510 shares of stock in Bass & Associates when the stock was transferred from the Trust in 2008. Additionally, J. Howard Bass was given 100% of the stock in Esperada by Jim Bass. Excerpts from J. Howard Bass' examination transcript are attached hereto as *Exhibit B*.

(d)    **Clayton Stiba:** Clayton Stiba was an employee at Bass & Associates from January 2005 to January 15, 2010. Clayton Stiba was interviewed and hired by Jim Bass. Clayton Stiba began as a landman for Bass & Associates. At the time he left, Clayton Stiba was Vice-President. Clayton Stiba still owns 122.5 shares of stock in Bass & Associates. Clayton Stiba's examination transcript is attached hereto as *Exhibit C*.

(e)    **Amy Locke:** Amy Locke was employed at Bass & Associates from March 2008 to February/March 2010 as the Manager of Leases. Amy Locke was interviewed and hired by Jim Bass. At Jim Bass' direction, Amy Locke assisted with the acquisition of properties, seeing those properties through the title process, and following through to closing.

Amy Locke also assisted with ordering the title work on all new leases taken in the name of Acadian Energy Resources, LLC, Acadian Energy Resources, Inc., Bass & Associates, among others. Additionally, at Jim Bass' direction, Amy Locke assisted with the purchase of the majority of the assets owned by Esperada located in the Cayman Islands. Amy Locke still owns 122.5 shares of stock in Bass & Associates. Amy Locke's examination transcript is attached hereto as *Exhibit D*.

(f) **Gregory Czap:** Gregory Czap began working for Jim Bass in 2005. He first worked for Jim Bass' entity named Esperada Shale, LLC. Gregory Czap continued to work for Jim Bass until December 2008 as either an employee or an independent contractor. Excerpts from Gregory Czap's examination transcript are attached hereto as *Exhibit E*.

## A. Jim Bass

12. On January 18, 2001, Jim Bass filed a voluntary bankruptcy petition under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. § 101 *et. seq.* (the "Bankruptcy Code") in the Western District of Texas, Austin Division. The case is styled and numbered *In re James H. Bass*, Case No. 01-10148 ("Jim Bass' First Bankruptcy Case"). An order of discharge was entered on June 17, 2001.

13. At the time of Jim Bass' First Bankruptcy Case, Daesung Energy Resources, Inc. ("Daesung") filed a timely complaint before this Court to determine the non-dischargeability of debt. That dischargeability action was given Adversary No. 01-01116. Therein, Daesung pled that it was the holder of a final judgment against Bass for damages in the amount of $1,750,000.00, attorneys' fees in the amount of $401,783.00, and exemplary damages in the amount of $1,389,576.58. Daesung sought to have its entire judgment determined to be non-dischargeable pursuant to Bankruptcy Code § 523(a)(2)(A). On December 19, 2001, this Court entered its Judgment Holdings Debts Owing

5

to Plaintiff Non-Dischargeable, declaring the entire judgment owed to Daesung for damages, attorneys' fees and exemplary damages, plus costs, as non-dischargeable (the "Daesung Judgment").

14. On or about March 11, 2005, BlueRidge Gas Partners, LLC ("BlueRidge"), obtained a judgment against Jim Bass in the 129th Judicial District Court of Harris County, Texas, for actual damages in the amount of $2,187,036.00, plus pre-judgment interest in the amount of $51,530.16, post-judgment interest at the rate of 5% per annum, and attorneys' fees in the amount of $11,506.75 (as modified by that one certain Judgment *Nunc Pro Tunc*, the "BlueRidge Judgment"). As of June 3, 2009, the total amount alleged to be owed to BlueRidge was in excess of $2,769,164.

15. On June 3, 2009 (the "Petition Date"), Jim Bass filed a second voluntary petition for relief under chapter 7 of the Bankruptcy Code in the Western District of Texas, Austin Division. The case is styled and numbered *In re James H. Bass*; Case No. 09-11451 ("Jim Bass' Second Bankruptcy Case"). On April 21, 2010, the Court entered an order denying Jim Bass' discharge pursuant to Bankruptcy Code § 727 because Jim Bass failed to disclose the transfer of his ownership interest in CB Energy, LLC. A true and correct copy of the April 21, 2010, order is attached hereto as *Exhibit F*.

16. Currently, Jim Bass is in prison on the charge of driving while intoxicated (third), a second degree felony. According to the Contingent First Motion for Continuance of Trial Only filed by Jim Bass ("Motion for Continuance") in Jim Bass' Second Bankruptcy Case related to a claim objection, Jim Bass may be getting out of prison after July 2010.

**B.      J. Howard Bass & Associates, Inc.**

17. Bass & Associates was formed in 2004. A true and correct copy of the Articles of Incorporation for Bass & Associates is attached hereto as *Exhibit G*. According to Jim Bass' 2004 examination and bankruptcy schedules and statements of financial affairs, he has *never* been involved with Bass & Associates; Peggy Sue Bass and J. Howard Bass have complete control, and always have

had complete control, over the operations.  This is *categorically* not true.  Most significantly, when Bass & Associate was first formed, Jim Bass was the incorporator, a director, and was chairman of the board.  Jim Bass remained chairman of the board until November 20, 2006, when he resigned.  A true and correct copy of his letter of resignation is attached hereto as *Exhibit H*.  Despite his "resignation," Jim Bass remained the ultimate decision maker for Bass & Associates.

18.     Moreover, Jim Bass entered into a consulting agreement with Bass & Associates on February 15, 2005, *prior* to his resignation as chairman of the board, which identified that Jim Bass would perform the following services:

> the consultant will consult with the officers and directors of the company concerning matters relating to employees of the company, concerning matters relating to the management and organization, their financial policies, the terms and conditions of employment, and generally any matters arising out of the business affairs of the company.

A true and correct copy of the Consulting Agreement is attached hereto as *Exhibit I*.  The term of the Consulting Agreement was for "as long as the services of the consultant are required by the corporation."  Essentially, this Consulting Agreement made Jim Bass the "president" of Bass & Associates.  To the best of the Trustee's knowledge, this Consulting Agreement is still in place and Jim Bass remains the ultimate decision maker for Bass & Associates.  To be clear, however, despite the fact that certain corporate formalities have been observed, Bass & Associates is, effectively, Jim Bass.

19.     In addition, as recently as January 31, 2008, despite his "lack of involvement," Jim Bass held himself out as President of Bass & Associates.  Jim Bass executed Wire Transfer Instructions identifying him as the President of Bass & Associates.  A true and correct copy of Wire Transfer Instructions dated January 31, 2008, and executed by Jim Bass as President of Bass & Associates is attached hereto as *Exhibit J*.  Moreover, Peggy Sue Bass testified that Bass & Associates sole revenues always came from Jim Bass' knowledge and actions in the oil and gas business.  Peggy Sue Bass'

Examination Transcript pg. 37, ln. 18-22.  But for Jim Bass, Bass & Associates would not have existed, generated revenues, or been able to do business.

20.     J. Howard Bass was first named the President of Bass & Associates in December 2004--at age 15.  A true and correct copy of the Minutes of First Meeting of Board of Directors of Bass & Associates dated December 15, 2004, is attached hereto as *Exhibit K*.  When asked whether he was aware at that time that he was President of Bass & Associates J. Howard Bass testified "It was brought up to me, but I didn't under – again, I was so young, I didn't really understand what it really meant." J. Howard Bass' Examination Transcript pg. 29, ln. 11-17.  Further evidence of the fact that J. Howard Bass' was nominally named President of Bass & Associates by Jim Bass for the purpose of concealing his assets and defrauding his creditors.

21.     As is clear from the 2004 Examination transcripts attached hereto, Jim Bass has always been in complete control of Bass & Associates and made the final decisions on all of Bass & Associates business transactions.  J. Howard Bass was nominally named as President of Bass & Associates as part of Jim Bass' scheme to conceal his assets and defraud his creditors.

22.     Clayton Stiba testified under oath that Jim Bass owned and controlled Bass & Associates, even though the shares of Bass & Associates were nominally titled in others.  Clayton Stiba testified that he quit working for Bass & Associates on January 15, 2010, because "I can't do this no more."  Clayton Stiba's Examination Transcript pg. 7, ln. 6-10.  When asked to explain, Stiba testified under oath that "pretty much everybody took their cue from Jim Bass."  Clayton Stiba's Examination Transcript pg. 7, ln. 11-21.

> Q.  And what was your understanding when you first came to work for J. Howard Bass & Associates of the role that Jim Bass played at J. Howard Bass & Associates,  Inc.?
> A.  That he was a geologist and geophysicist.  And that, you know, he put ideas together, plays together, and basically they -- the way it was explained to me when I was hired, that he would go to those

different operators and/or investors to ask them if they wanted to get involved in this acquisition or this production package, or whatever it was that he was showing at the time.

Q. Okay. In terms of the overall direction of the business operations of J. Howard Bass & Associates, Inc., what was your understanding of Jim Bass' role?

A. His role was -- visually he ran things, if that's what you're getting at.

Q. That's exactly what I'm getting at.

A. Yeah.

**Q. It's your testimony that Jim Bass ran things at J. Howard Bass & Associates?**

**A. Yes.**

**Q. And when you say "ran things," do you mean every aspect of the business that J. Howard Bass & Associates was involved in?**

**A. Sure.**

**Q. Is there any aspect of the business that J. Howard Bass & Associates, Inc., conducted that Jim Bass was not in charge of?**

**A. No.**

**Q. Okay.**

**A. I mean, he -- Jim's a micro manager. He liked to have his fingers in all the pies.**

**Q. In fact, he had his fingers in all the pies?**

**A. Sure.**

**Q. Everything that J. Howard Bass & Associates, Inc., did was under the control and direction of Jim Bass?**

**A. Ultimately, yes.**

Clayton Stiba's Examination Transcript, pg. 14, ln. 7 – pg. 15, ln. 20.

23.     Even as Clayton Stiba progressed from landman to Vice President, he testified that his

duties never changed and James Bass retained control:

> A My duties never really changed. It was the title.
> Q When you were vice president, did you still report to Jim Bass?
> A Yes.
> **Q Just to be clear, is it your testimony that the entire time you were there at J. Howard Bass & Associates, that Jim Bass was in control of every aspect of the operations of J. Howard Bass & Associates, Inc.?**
> **A Yes.**
> **Q That never changed?**
> **A No.**
> **Q Not from day 1, not to the last day?**
> **A No.**

4442488.1
56171.4

24.     Regarding the designation of J. Howard Bass as President of Bass & Associates, Clayton Stiba testified that it was all a matter of form:

> Q What is your understanding of what J. Howard Bass did at J. Howard Bass & Associates, Inc.?
> A What did he do?
> Q Yes.
> A His daddy gave him a job.
> Q Does daddy also give him a company?
> A Yeah, he did.
> **Q Do you believe that J. Howard Bass was in any way the president of the company other than in title?**
> **A No, he was not president other than in title.**
> Q Why do you think Jim Bass made J. Howard Bass the title of president of the company?
> A I don't know. I can speculate. But I don't have -- I don't know that it wasn't in his mind – he didn't tell me. If you want me to speculate, I will.
> **Q So you said you don't know. Now I'd like you to speculate.**
> **A I would speculate that he made J. Howard president and majority owner for a number of reasons. Number one, his name wasn't on it. Jim Bass' name one on the company.**
> Q And you think that was important to Jim Bass to not have his name on the company?
> A Having looked down this road now, I would say yeah, it probably was.
> Q Now, you're still speculating on that?
> A Yes, I am. Because I can't say, again, with any definitives that he did it for any other reason.

Clayton Stiba's Examination Transcript, pg. 20, ln. 20 – pg. 21, ln. 22. When asked why Jim Bass would have named J. Howard Bass president of Bass & Associates, Gregory Czap testified "[t]o hide from his creditors, to hide from the lawsuit." Gregory Czap's Examination Transcript pg. 42, ln. 6-ln. 10.

25.     Clayton Stiba further explained his opinion that Jim Bass made J. Howard Bass President of Bass & Associates and concealed his ownership of Bass Associates because of Jim Bass' "checkered" past.

4442488.1
56171.4

Q Did Jim Bass ever tell you that it was important to him to not have his name on the company in any official capacity?
A I don't think he's ever come out and said it like that.
Q Has he said things from which you could draw a reasonable inference that it was important to him to not have his name on the company?
A Again, that's drawing an opinion. If you're asking my opinion, I would say yes.
Q I am. What specific things did he tell you?
A I knew that going into this that he had already had some -- what would one say -- run-ins. We knew about Daesung, we knew about Blue Ridge, but they had been dismissed. And so in order to -- that, and he had some other little checkered past with a firearm, and he just wanted to stay under the radar.
Q Right. And when you say "under the radar," what you mean is that he wanted to do everything he could to own and control this business, J. Howard Bass & Associates, but keep it from the reach of his creditors, including Daesung and Blue Ridge?
A Well, now you're asking me for my opinion.
Q Again, I am.
A I don't know. I mean, yeah, I think that's probably what he was doing, but that's just my opinion.

Clayton Stiba's Examination Transcript, pg. 21, ln. 23 – pg. .

26.     As further evidence that Bass & Associates was nothing more than a business conduit of Jim Bass, in April 2009, at Jim Bass direction, Bass & Associates agreed to present a portion or all its assets to Daesung in an effort to settle the Daesung Judgment.

> **Q.  And do you recall Jim Bass developing a plan to use assets of J. Howard Bass & Associates, Inc., to try and settle the Daesung judgment?**
> **A.  Yes.**
> **Q.  And wasn't it in fact a plan developed by Jim Bass as opposed to anybody else?**
> **A.  Well, yes.  It's all that he had left.**
> Q.  And what to your recollection was Jim Bass' plan to resolve the Daesung judgment?
> A.  He was going to offer up all the working interests that – overrides, excuse me.  Overrides that were – remained at – that we had assignments for out of West Virginia and then some mineral ownership as well that J. Howard Bass & Associates owned.
> Q.  And were all of the assets that were being considered to be utilized to settle the Daesung judgment assets that were held by J. Howard Bass & Associates, Inc., or were any of them that were

11

being considered to be used held by another entity such as Acadian Energy Resources, L.L.C., or Acadian Energy Resources, Inc.?

A. They were all coming from J. Howard Bass & Associates, Inc., Acadian, Inc., and L.L.C. – Inc., let me address it, didn't own anything. L.L.C., the only thing it owned was a house in West Virginia and seven acres.

....

Q. And the – as I understand it, the issue of should J. Howard Bass & Associates, Inc., used its assets to try and settle the Daesung judgment was put to the shareholders of J. Howard Bass & Associates, Inc., correct?

A. Yes.

Q. At an officially called shareholders meeting, correct?

A. As I recall.

Q. And do you recall being at that meeting?

A. Yes, I do.

Q. And do you recall the events of that meeting?

A. Not all of them.

Q. Okay. What do you recollect of that meeting?

A. Being – obviously the biggest item on the agenda there was to see if we would help facilitate making Daesung go away, and by paying them off with an asset which we held. It was the only viable option at the time for negotiation. And when you get right down to it, it wasn't obviously my most favorite thing to have to do when you worked really hard to put something together and you know good and well that the majority interest is going to vote one way, you don't have a whole lot of latitude in what you're going to do at a meeting like that.

Q. And how did you know good and well that the majority interest was going to vote one way?

A. Come on, man.

Q. I have to ask these questions.

A. Well, let's see. J. Howard Bass owns 50 percent of that company and his mother owns 12 and a half percent of that company. There you go. That's all they needed.

**Q. Is it your testimony that J. Howard Bass and Peggy Bass would do whatever they were told by Jim Bass?**

**A. Well, sure. A lot of people did that. He led by fear and intimidation.**

Clayton Stiba's Examination Transcript, pg. 25, ln. 19 – pg. 26, ln. 18; pg. 28, ln. 12 – pg. 19, ln.

23. A true and correct copy of the Unanimous Written Consent in Lieu of Special Meeting of

All Shareholders and Directors of J. Howard Bass & Associates, Inc. is attached hereto as

*Exhibit L.* When asked why she would agree to put up all of the assets of a company that she owned stock in for Jim Bass, Amy Locke testified that if Jim Bass wanted something taken care off by Bass & Associates, it was taken care of by Bass & Associates.

> Q. Let me ask you this: You were a shareholder of J. Howard Bass & Associates, Inc., during the time that the proposed resolution of the Daesung judgment was being discussed. Correct?
> A. Yes.
> Q. And you were being asked as a shareholder to agree to use assets owned by J. Howard Bass & Associates, Inc., to settle a claim against Jim Bass individually. Correct?
> A. Yes.
> Q. And ultimately, you agreed and supported that in your capacity as a shareholder. Correct?
> A. Yes.
> Q. And why -- why did you reach that decision, to agree to use corporate assets of J. Howard Bass & Associates, Inc., to resolve a claim against Jim Bass individually?
> A. Well, to settle that debt so that the company could move forward and Jim could move forward in other transactions.
> Q. Okay. And is that because Jim Bass was essential to the continued operations of J. Howard Bass & Associates, Inc.?
> A. Yes.
> Q. And in what way was Jim Bass essential to the operations of J. Howard Bass & Associates, Inc.?
> A. I believe, as I stated earlier, that he was -- himself and Mr. Stiba put together the deals to -- and the investor packages and all of that, to keep it going.
> Q. Okay. You also said that in your view Mr. Stiba was interchangeable with Mr. Bass.
> A. Yes. He has -- he has a vast knowledge of the oil and gas business and knows many players, just as Mr. Bass does.
> **Q. Okay. Why not then just say, "Well, Jim, I'm sorry you have got this judgment against you, but the company is going to proceed ahead with Mr. Stiba playing that role"?**
> **A. Well, quite frankly, Mr. Bass wanted to settle the judgment. So that was his way of settling the judgment.**
> **Q. And ultimately, is it your testimony that if Mr. Bass wanted to do it, then J. Howard Bass & Associates, Inc., was going to take care of it?**
> **A. Yes, sir.**

Amy Locke's Examination Transcript pg. 118, ln. 4 – pg. 119, ln. 23.

4442488.1
56171.4

27.     Bass & Associates currently owns stock in Pest Away, Inc. and has interests in oil and gas leases in Texas, West Virginia, Michigan, and other states.  Additionally, Bass & Associates owns one-hundred percent (100%) of Bass Air.  All of these assets were purchased at the direction of Jim Bass.

## C.     Esperada Holdings, Inc.

28.     Esperada is a corporation formed under the laws of the Cayman Islands.  True and correct copies of Esperada's Certificate of Formation and Memorandum of Association are attached hereto as *Exhibits M* and N.  Esperada was formed on July 1, 2008.  On paper, J. Howard Bass is the sole shareholder in Esperada.  However, as with Bass & Associates, Jim Bass, has always been in complete control of Esperada from its inception.  Attached hereto as *Exhibit O* is an advertisement found in the magazine Caribbean Cruising, Third Quarter 2008.  This advertisement identifies Jim Bass as the President of Esperada.  Clayton Stiba testified specifically that Jim Bass was the face of Esperada in the Cayman Islands.

> **Q.  Now, we've talked about the role that Jim Bass played with J. Howard Bass & Associates, and you testified about his control of every aspect of that business.  Is that the case as well for Esperada Holdings Company, Inc., did Jim Bass control the operations and manage that entity?**
> **A.  For the most part, yes.**
> Q.  Anybody else involved?
> A.  Well, we had, you know, smaller roles but,  yeah, I was named as a director on that company for -- until the day I left.  So I had input into that as well as, you know, Amy Locke helped with it, and Jim, Peggy.  I mean, we all had some involvement in it.  Now, when it  came to making final decisions, usually it fell to -- everybody got to weigh in.  Whether it was what Jim wanted to hear or not, it usually went Jim's way.
> Q.  Can you ever think of an instance where Jim wanted to do one thing with respect to Esperada Holdings Company, Inc., and you or anybody else disagreed with that proposed course of action, that it didn't go Jim's way?
> A.  I can't recall.
> Q.  You can't think --

4442488.1
56171.4

A.  I can't think of an instance right off the top of my head.  It may come to me.

**Q.  Okay.  Fair enough.  But by and large, the  vast majority of the decisions went exactly the way Jim Bass wanted them to go?**

**A.  Yeah.  He spent his money where he wanted to.**

Q.  And, in your view, when you're talking about  him spending his company, you're saying that the profits from J. Howard Bass & Associates, Inc., that were taken and diversified into Esperada Holdings Company, Inc., was Jim Bass' money?

A.  Well, I think that a lot of people would look at it like that.  Some of us were lower down on the chain, if you will, weren't going to benefit from it.  I knew someday that I probably would -- might see something out of this.  But, yeah, to answer your question, it was Jim Bass' money.

Q.  Okay.  Were you around when Esperada Holdings Company, Inc., was set up?

A.  I was there.

Q.  Do you know why it was set up so that J. Howard Bass was the sole shareholder?

A.  Just so that he could make sure that he takes care of his boy.  Jim always kind of was -- not always but sometimes got a little morbid, he's a Type A diabetic -- excuse me -- Type 1 diabetic.  So he toyed  with his mortality.  "Just in case I die, J. Howard will have something."  That kind of thing.

**Q.  But is it your understanding that at least as long as Jim Bass was alive, he considered himself, as did everybody else involved with Esperada Holdings Company, Inc., to be the real owner of the company?**

**A.  Oh, yes.  If you went down there, you – and you asked them who I was, only our company could probably come up with my name, at best.**

**Q.  Because the face of Esperada Holdings Company, Inc., to anybody that was dealing with Esperada Holdings Company, Inc., in terms of who was in charge and who really owned the company was Jim Bass?**

**A.  Oh, yeah.  Absolutely.**

Clayton Stiba's Examination Transcript pg. 37, ln. 20 – pg. 40, ln. 7

29.     Additionally, despite being the sole shareholder, J. Howard Bass does not know who is the president of Esperada.

Q.  Okay.  I'll show you a document that I've marked as Bass 5.  If you could take that and turn – I'll tell you which page.  First of all,

let me ask you: Are you familiar with this magazine or magazine known as Caribbean Cruising?

A. I've heard of it, yes, sir.

Q. Okay. Have you ever had – have you ever come across one of these magazines, not necessarily this particular issue, but a Caribbean Cruising magazine?

A. I have not personally, no, sir.

Q. Okay. And so have you ever seen this particular issue of this magazine? I guess the answer is "non"?

A. Correct. No.

Q. Okay. If you could, turn to the tenth page. In the bottom right-hand corner, there's an Esperada Holdings Company test, I guess. First of all, have you ever heard of an entity know as Esperada Holdings Company, Inc.?

A. Yes, sir, I have.

Q. And do you personally own any interest in Esperada Holdings Company, Inc.?

A. Yes, sir, I do.

Q. And how much interest do you hold?

A. I am the majority shareholder. I am the only shareholder of the company.

Q. Okay. The sole shareholder of the company?

A. Yes, sir. Yes, sir.

Q. And you individually are the owner of that, not J. Howard Bass & Associates, Inc.?

A. Correct.

Q. Okay.

A. To my knowledge, yes, sir.

**Q. Okay. Is Jim Bass the president of Esperada Holdings Company, Inc.?**

**A. I don't know. When I saw that, I – When I looked down there and saw that, I thought that to myself as well.**

**Q. You thought, "I wonder if he's the president of Esperada Holdings Company, Inc."?**

**A. Correct.**

J. Howard Bass' Examination Transcript pg. 93, ln. 10 – pg. 94, ln. 25.

30.     Esperada currently owns assets worth millions of dollars in the Cayman Islands. Specifically, Esperada owns: (1) an apartment complex; (2) five boats, including the Cayman Prince, the Miss Toni, the Chadster, and the Lick'em & Stick'em (also known as the L&S); (3) a watersports company named Trident Watersports; and (4) multiple vehicles including a BMW X3, a Mini-Cooper,

4442488.1
56171.4

a Mercedes, a BMW Sedan, a Ford F-250, and a Land Rover. *See* Locke's Examination Transcript pages 16-45; Stiba's Examination Transcript page 72. Attached hereto as *Exhibit P* are the Certificate of Vehicle Ownership Registration for the Land Rover, the F-250, the and Mercedes, respectively. Additionally, Esperada made large payments to a company named Captain Marvin's Water Sports, supposedly deposits for the potential purchase of this company. Attached hereto as *Exhibit Q* are bank statements identifying the funds transferred from Bass & Associates to Captain Marvin's Water Sports. Examination testimony indicates that the purchase was not completed; however, the Trustee believes further investigation of this transaction is necessary.

31.     After the filing of Bass' Second Bankruptcy Case, Esperada sold the following assets: (1) a home in the Cayman Islands on Kai Pad; and (2) interests in two condominium projects in a Cayman Islands—The Waterford and the Grand Caymanian Resort. *See* Locke's Examination Transcript pages 16-45. According to Peggy Sue Bass, approximately $600,000 from the sale of these assets remains in either Esperada's bank account or Esperada's attorneys' bank account in the Cayman Islands. *See* Peggy Sue Bass' Examination Transcript pg. 10.

32.     All of the assets described above, the assets currently owned and the assets already sold, were all purchased at the direction of Jim Bass. Funds were made available by Bass & Associates for the purchase of these assets. True and correct copies of various minutes from Bass & Associates' Board of Directors meetings are attached hereto as *Exhibit R* evidencing that Bass & Associates, through the direction of Jim Bass, was making all business decisions for Esperada along with all decisions regarding assets and property to purchase in the Cayman Islands. Additionally, attached hereto as *Exhibit S* are true and correct copies of financial statements of Bass & Associates which include various assets supposedly owned by Esperada.

4442488.1
56171.4

## D.    Summary

33.    Bass & Associates and Esperada are the alter egos of Jim Bass.  Jim Bass formed these entities and used these entities as a shelter for his assets from his creditors.  Peggy Sue Bass and J. Howard Bass conspired with and assisted Jim Bass in defrauding his creditors.  Jim Bass made members of his immediate family and individuals under his control shareholders and directors so he could stay in control of the entities and his assets.  However, from each entities inception, Jim Bass was the true owner of the entities and all of their assets.

## IV.  CAUSES OF ACTION

## A.    TURNOVER AND ACCOUNTING OF ESTATE PROPERTY (Jim Bass)

34.    Paragraphs 1 through 33 are incorporated herein as if set forth in full.

35.    Bankruptcy Code § 542(a) requires the debtor and all entities having possession custody or control of property that the trustee could use, sell or lease pursuant to section 363, or that the debtor could exempt under section 522, turn over that property to the trustee and account for the property and/or the value of the property.

36.    Despite the fact that Jim Bass is required to account for all property in his bankruptcy schedules, he failed to turn over all property to the trustee and failed to properly account for all of his assets.  Jim Bass' discharge was denied for failing to disclose the transfer of his interest in CB Energy, LLC.  In addition, Jim Bass failed to account for millions of dollars in cash and assets.  Jim Bass received wire transfers from various parties that range in value of hundreds of thousands to millions. Jim Bass failed to disclose the location of these funds and the bank account statements where these funds are located.

37.    The Trustee hereby requests the Court order Jim Bass to turnover and provide an accounting of all estate assets.  The accounting should include, but is not limited to, the following: (1) an accounting of all wire transfers and other forms of payment and consideration received by Jim

18

Bass from January 2005 through the Petition Date and the disposition of same; (2) all account statements for all bank accounts maintained by Jim Bass from January 2005 through the Petition Date, including, but not limited to, bank statements for foreign bank accounts; (3) an accounting of Jim Bass' ownership in all real and personal property from January 2005 through the Petition Date; (4) an accounting of Jim Bass' ownership of stock and/or interests in any and all entities from January 2005 through the Petition Date; and (5) an accounting of any and all transfers of interests in real or personal property (along with transfers of interests in business entities and/or transfers of stock) by Jim Bass from January 2005 through the Petition Date.

**B.      SUBSTANTIVE CONSOLIDATION (Esperada and Bass & Associates)**

38.      Paragraphs 1 through 37 are incorporated herein as if set forth in full.

39.      Courts have developed tests to determine when the facts of a particular case establish the criteria needed to merit substantive consolidation.  The two principal tests are often referred to as the "balancing test" and the "elements test.  Substantive consolidation is appropriate in this case under either test.

### i.      Elements Test

40.      The elements test requires courts to determine whether there is a strong relationship among the debtors.  To make this determination, courts evaluate the underlying facts to determine following whether substantive consolidation is warranted.   The following elements are often considered:

> (1)      the degree of difficulty in segregating and ascertaining individual assets and liability;
>
> (2)      the presence or absence of consolidated financial statements;
>
> (3)      the profitability of consolidation at a single physical location;

> (4)      the commingling of assets and business functions;
>
> (5)      the unity of interests and ownership between the various corporate entities;
>
> (6)      the existence of parent and intercorporate guarantees on loans; and/or
>
> (7)      the transfer of assets without formal observance of corporate formalities.

No single element or factor is determinative as to whether substantive consolidation is warranted; courts must look at the totality of the underlying facts and circumstances. *Id.*

41.      Pursuant to the Elements Test, the assets and liabilities of Bass & Associates and Esperada should be consolidated with Jim Bass' Bankruptcy Estate. There is a substantial relationship between Jim Bass and Bass & Associates and Esperada—Jim Bass exercised exclusive control over both Bass & Associates' and Esperada's business. Jim Bass made all business decisions—including the decision to make all of Bass & Associates assets available to pay off his personal debt owned to Daesung. Additionally, there is significant unity of interests and ownership between Jim Bass, Bass & Associates, and Esperada—the assets of Bass & Associates and Esperada are the assets of Jim Bass. Jim Bass equals Bass & Associates; Jim Bass equals Esperada. This unity of interests and ownership would make it impossible to segregate and ascertain the individual assets and liability of Bass & Associates, Esperada, and Jim Bass. Again, Jim Bass equals Bass & Associates; Jim Bass equals Esperada. Moreover, the fact that the assets of Bass & Associates and Esperada are truly the assets of Jim bass establishes that there was commingling of assets. In addition, there was significant commingling of business functions. Esperada and Bass & Associates had consolidated financial statements and Jim Bass, Bass & Associates, and Esperada maintained offices at the same location and utilized the same individuals as agents and employees.

4442488.1
56171.4

### ii.    **Balancing Test**

42.    The balancing test requires the proponent to show not only a substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or to realize some benefit. The proponent must show that the benefits of consolidation heavily out weigh the harm. The balancing test has two variations—the "either/or" test and the "burden-shifting" test. Substantive consolidation is appropriate under either variation.

43.    Under the either/or test, substantive consolidation is appropriate when either one of following two conditions is satisfied: (1) creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) the affairs of the debtor are so entangled that consolidation would benefit all creditors. The Court should order substantive consolidation because Esperada and Bass & Associates dealt with both entities as a single economic unit—they dealt with both entities as if they were dealing with Jim Bass individually. As stated by Clayton Stiba, no one in the Cayman Islands would know who he was or who J. Howard Bass was and, definitely, would not know his involvement or J. Howard Bass' involvement in Esperada. Moreover, Jim Bass signed documents as the president of Bass & Associates. He made all business decisions and controlled all aspects of its operations. The creditors doing business with Bass & Associates were doing business with Jim Bass individually.

44.    Under the burden-shifting test, the proponent must establish a *prima facie* case for consolidation by showing that (1) there is a substantial identity of the entities to be consolidated and (2) consolidation is necessary to avoid some harm or realize some benefit. After a *prima facie* case is established, an objecting party may try to defeat substantive consolidation by showing that (1) it relied on the separate credit of one of the entities to be consolidated and (2) it would be prejudiced by the consolidation. *Id.*

4442488.1
56171.4

45.     Consolidation is also proper under the burden-shifting test.  There is a substantial identity of the entities to be consolidated.  Jim Bass controlled all aspects of Bass & Associates and Esperada's businesses. As stated above, Jim Bass equals Bass & Associates; Jim Bass equals Esperada. Moreover, creditors dealt with Jim Bass, Bass & Associates, and Esperada as a single economic unit and legitimate creditors did not rely on their separate identity in extending credit.  Consolidation is necessary to avoid harm to Jim Bass' creditors.  Without consolidation, Jim Bass' creditors, including Daesung and BlueRidge, would be prejudiced because they would receive significantly less than they would if the assets and liabilities nominally owned by Bass & Associates and Esperada were consolidated into Jim Bass' Bankruptcy Estate.  Moreover, consolidating the estates would benefit Jim Bass' Bankruptcy Estate and creditors because consolidating the estates would make assets available for distribution to Jim Bass' creditors that would have been available but for his fraudulent concealment and hiding of assets.

46.     The benefits of substantively consolidating Bass & Associates and Esperada into Jim Bass' Bankruptcy Estate greatly outweighs any harm by such action.  Following their substantive consolidation, the consolidated case should proceed under Jim Bass' Second Bankruptcy proceeding, with C. Daniel Roberts acting as Chapter 7 Trustee for the consolidated estates.

## C.     REVERSE VEIL PIERCING—ALTER EGO (Esperada and Bass & Associates)

47.     Paragraphs 1 through 46 are incorporated herein as if set forth in full.

48.     To establish reverse veil piercing and determine that a corporation is the alter ego of an individual, the Trustee must show: (1) that the individual has a de facto ownership in the corporation; (2) that the corporation was organized and operated as a mere tool or business conduit for the individual, considering the total dealings of the corporation and the individual, including the degree to which corporate formalities have  been followed and corporate and individual property have been kept

4442488.1
56171.4

separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes; and (3) whether applying reverse veil piercing would prejudice non-culpable shareholders or other stakeholders or creditors.

49.     The Trustee seeks to reverse veil pierce and a determination that Esperada and Bass & Associates were the alter egos of Jim Bass. First, as discussed throughout this Complaint, Jim Bass is Esperada and Bass & Associates. There was such unity between Esperada, Bass & Associates, and Jim Bass that the separateness of Esperada and Bass & Associates does not exist—Jim Bass equals Esperada; Jim Bass equals Bass & Associates. The assets of Esperada and Bass & Associates are the assets of Jim Bass. Additionally, Esperada and Bass & Associates were both utilized as mere tools or business conduits of Jim Bass. Those doing business with Esperada and Bass & Associates thought they were doing business with Jim Bass. Moreover, Jim Bass caused Esperada and Bass & Associates to be used for the purpose of perpetuating and did perpetuate an actual fraud on his creditors, for his direct and personal benefit. Thus, Bass & Associates and Esperada were the alter egos of Jim Bass and the Court should order the reverse veil piercing of Esperada and Bass & Associates. As stated above in the substantive consolidation section, the benefits of substantively consolidating Bass & Associates and Esperada into Jim Bass' Bankruptcy Estate greatly outweighs any harm by such action. Simply, Jim Bass concealed assets that would have otherwise be available to satisfy the claims of his creditors. Reverse veil piercing makes those assets available for distribution, to the benefit of his creditors.

50.     The Trustee requests the Court enter an order reverse veil piercing and declaring Bass & Associates and Esperada the alter-egos and/or straw men of Jim Bass and, as such, all

assets owned, controlled and/or held by such entities and individuals should be determined to be the assets of Jim Bass.

**D.     TURNOVER AND ACCOUNTING OF ESTATE PROPERTY (Peggy Sue Bass and J. Howard Bass)**

51.     Paragraphs 1 through 50 are incorporated herein as if set forth in full.

52.     Bankruptcy Code § 542(a) requires all entities having possession custody or control of property that the trustee could use, sell or lease pursuant to section 363, or that the debtor could exempt under section 522, turn over that property to the trustee and account for the property and/or the value of the property.  To support a cause of action for turnover and accounting of estate property, the trustee must establish: (1) the property is in the possession, custody or control of a noncustodial third party; (2) the property constitutes property of the estate; (3) the property is of the type that the trustee could use, sell or lease pursuant to section 363 or that the debtor could exempt under section 522; and (4) that the property is not of inconsequential value or benefit to the estate.

53.     Upon the Court's determination that Bass & Associates and Esperada should be substantively consolidated into Jim Bass' Bankruptcy Estate, the Trustee requests the Court order Peggy Sue Bass and J. Howard Bass to turn over and account for all property of Jim Bass' Bankruptcy Estate.  Following substantive consolidation, Peggy Sue Bass and J. Howard Bass will have and control property that belongs to Jim Bass' Bankruptcy Estate.  This property will be utilized by the Trustee to satisfy Jim Bass' creditors claims.  Specifically, the Trustee will liquidate this property to make the funds available for distribution to Jim Bass' creditors.  Assets the titled in Peggy Sue Bass and/or J. Howard Bass' name and/or under their control is not of inconsequential value—the assets could be valued in the millions of dollars.  Therefore, upon the substantive consolidation of Bass & Associates and Esperada into Jim Bass' Bankruptcy Estate, the Trustee requests the Court order Peggy Sue Bass

24

and J. Howard Bass to turn over and account for all property of Jim Bass' Bankruptcy Estate that is under their control.

E. **TURNOVER OF INFORMATION RELATING TO JIM BASS' PROPERTY OR FINANCIAL AFFAIRS (Bodden & Bodden & Bodden Corporate Services Ltd.)**

54.     Paragraphs 1 through 53 are incorporated herein as if set forth in full.

55.     Bankruptcy Code § 542(e) authorizes a court, after notice and a hearing, to order an attorney, accountant, or any other person to turn over or disclose to the estate documents or books relating to the debtor's property or financial affairs, subject to any privilege that may be asserted by the professional holding the documents or books.  To be entitled to turnover, the Trustee must establish that the information requested relates to the debtor's property and/or financial affairs.

56.     Upon the Court's determination that Bass & Associates and Esperada should be substantively consolidated into Jim Bass' Bankruptcy Estate, the Trustee hereby requests that Bodden & Bodden and Bodden Corporate Services Ltd. turn over all documents, books, and information related to Jim Bass' property and/or financial affairs, except, at this time, those subject to the attorney-client privilege.  Additionally, the Trustee hereby requests that Bodden & Bodden and Bodden Corporate Services Ltd. turn over all documents, books, and information nominally held in the name Esperada or Bass & Associates, except, at this time, those subject to the attorney client privilege.  Specifically, the Trustee requests that Bodden & Bodden and Bodden Corporate Services Ltd. turn over any and all of the following categories of documents: (1) documents evidencing wire transfers to and/or from Jim Bass, Esperada, and/or Bass & Associates; (2) documents related to the purchase of real and/or personal property by Jim Bass, Esperada, and/or Bass & Associates in the Cayman Islands, including but not limited to interests in condominium projects, boats, cars, houses, and/or apartment complexes; (3) documents evidencing bank accounts held in the Cayman Islands in the name of Jim Bass, Esperada, and/or Bass & Associates; and (4) any other documents related to Jim Bass' property and/or

25

financial affairs. These documents are related to Jim Bass' property and/or financial affairs because, as more fully explained in Section IV(A) and IV(B) above, Esperada and Bass & Associates are the alter egos of Jim Bass. Therefore, upon the substantive consolidation of Bass & Associates and Esperada into Jim Bass' Bankruptcy Estate, the Trustee requests the Court order Bodden & Bodden and Bodden Corporate Services Ltd. turn over all documents, books, and information related to Jim Bass' property and/or financial affairs, except, at this time, those subject to the attorney-client privilege.

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that all Defendants be cited to appear and answer and that upon final hearing the Court:

(1) order James H. Bass to turn over and account for all estate property;

(2) declare that J. Howard Bass & Associates, Inc. and Esperada Holdings are the alter egos of James H. Bass and order the reverse veil piercing of J. Howard Bass & Associates, Inc. and Esperada Holdings Company, Inc.;

(3) order the substantive consolidation of the assets of J. Howard Bass & Associates, Inc. with the bankruptcy estate of James H. Bass;

(4) order the substantive consolidation of the assets of Esperada Holdings with the bankruptcy estate of James H. Bass;

(5) grant a permanent injunction prohibiting J. Howard Bass, Peggy Bass, J. Howard Bass & Associates, Inc., Esperada Holdings, and/or their affiliates from transferring any assets of James H. Bass, J. Howard Bass & Associates, Inc., Esperada Holdings, and/or their affiliates;

(6) following substantive consolidation, order Peggy Sue Bass and J. Howard Bass to turnover and provide an accounting of all estate property;

4442488.1
56171.4

(7) following substantive consolidation, order Bodden & Bodden and Bodden Corporate Services Ltd. to turn over all documents, books, and information related to Jim Bass' property and/or financial affairs, except, at this time, those subject to the attorney-client privilege; and

(8) order such other and further relief, at law and equity, as this Court deems just and proper.

Respectfully submitted,

BROWN MCCARROLL, L.L.P.
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 (Fax)

By: */s/ Kell C. Mercer*
    Kell C. Mercer
    State Bar No. 24007668
    Afton Dee Sands
    State Bar No. 24060555

ATTORNEYS FOR PLAINTIFF
C. DANIEL ROBERTS, CHAPTER 7 TRUSTEE

4442488.1
56171.4